## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SHANA DEFILLIPIS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **3:14-CV-00115** |
| | : | **(Judge Mariani)** |
| **DELL FINANCIAL SERVICES, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

### MEMORANDUM OPINION

### I.    Introduction

Presently before the Court is a Motion to Dismiss for Lack of Subject Matter

Jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or to Stay Proceedings and

Compel Arbitration under 9 U.S.C. §§ 3-4 (Doc. 4). In the course of advancing this Motion,

Defendants argue that Plaintiff's entire Complaint, which arises from a debt that she

accrued pursuant to a credit agreement with Dell Financial Services, is subject to an

arbitration clause that requires arbitration of "any claim, dispute or controversy" arising out

of the Agreement. For the reasons discussed below, the Court will deny Defendant's

Motion insofar as it is raised under Rule 12. However, such denial is made without

prejudice to Defendants' ability refile the Motion to Stay Proceedings and Compel Arbitration

in the context of a motion for summary judgment following a period of limited discovery.

### II.    Procedural History

On December 9, 2013, Plaintiff, Shana Defillipis, filed a Complaint in the

Lackawanna County Court of Common Pleas, alleging a class action to recover damages

for harassing phone calls that she purportedly received from Defendant Dell Financial

Services. (*See generally* Compl., Doc. 1-3, at 1.)  The case was removed to federal court

on January 22, 2014.  (Notice of Removal, Doc. 1.)  Before removal, Plaintiff obtained a

default judgment in the Court of Common Pleas.  However, as discussed in greater detail in

the Court's most recent Opinion (Doc. 23), that default judgment was fatally tainted by

multiple improprieties, both in the manner in which Plaintiff served the Complaint and in the

manner in which she provided notice of her intent to take a default.  The Court therefore set

aside the default judgment.  It also rejected Plaintiff's arguments that removal to federal

court was untimely, concluding that the only reason that removal could be construed as

untimely was because of Plaintiff's own repeated procedural failures.[1]

Having set aside default judgment, it is now appropriate to decide whether Plaintiff's

Complaint can even advance in federal court at all.  In this regard, the Court notes that the

Complaint alleges relief on multiple grounds.  (*See* Compl. at pp. 15-32.)  All of these claims

for relief depend, however, on the allegations that Plaintiff received numerous harassing

phone calls from Defendant Dell Financial Services in connection with its attempted

collection of a debt.  (*See id.* at ¶¶ 10-26.)  But Defendants argue that, in the transaction

giving rise to the underlying debt, Plaintiff consented to submit all claims of this nature to

arbitration and waived her right to a judicial forum.  (Def.'s Mem. in Supp. of Mot. to

---

[1] Accordingly, though the parties spend considerable time briefing the issue of default, that issue has been rendered moot.

2

Dismiss, Doc. 5, at 3-4.) Accordingly, it moved for an Order compelling the parties to submit to arbitration and staying the federal proceedings. (*Id.* at 1.)

## III.   Standard of Review

### a.   Determining the Appropriate Standard

Defendants bring their Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, on the basis that this matter must be resolved through arbitration, and not through the judiciary. "Rule 12(b)(1), however, is not the correct rule of law under which to assert a contract-based defense requiring arbitration." *Masoner v. Educ. Mgmt. Corp.,* ___ F. Supp. 2d ___, 2014 WL 1766930, at *3 (W.D. Pa. 2014). "[M]otions seeking dismissal of a[n] . . . action on the basis that arbitration is required are not jurisdictional as they raise a defense to the merits of an action." *Liberty Mut. Fire Ins. Co. v. Yoder,* 112 Fed. App'x 826, 828 (3d Cir. 2004). "In other words, the existence of a valid contract compelling arbitration between the parties does not strip the court of its subject-matter jurisdiction." *Masoner,* 2014 WL 1766930, at *3. "Rather, such dismissals [on the basis of a valid arbitration agreement] are 'generally effected under Rule 12(b)(6) or Rule 56.'" *Yoder,* 112 Fed. App'x at 828 (quoting *Nationwide Ins. Co. v. Patterson,* 953 F.2d 44, 45 n.1 (3d Cir. 1991)). In deciding which Rule to follow, the Third Circuit has provided the following guidance:

> [W]hen it is apparent, based on "the face of a complaint, and documents relied upon in the complaint," that certain of a party's claims "are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." But if

3

the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then "the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on [the] question."

*Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 776 (3d Cir. 2013) (quoting

*Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F. Supp. 2d 474, 482 (E.D.

Pa. 2011)).

Here, it appears on the face of Plaintiff's Complaint that only that some arbitration

provision may be at issue. The Complaint contains a short section entitled "Arbitration."

(*See* Compl. at pp. 10-11.) Couched in vague language, that section reads as follows:

> Plaintiff submits that any alleged or perceived submission to binding arbitration was:
> A. Never expressly agreed to at any time by Plaintiff.
> B. Either proposed by Defendant through impermissible boilerplate language which was nearly illegible and/or indecipherable by an individual not legally trained, or submitted later in a deceptive manner as a proposed contract modification which was nearly illegible and/or indecipherable by an individual not legally trained.
> C. If somehow operative to Plaintiff's credit agreement, **only** operative to same, and not to be extended to any other agreement in which Plaintiff was a third party and had no privity with Defendant Creditor.
> D. Never gave express constant [*sic*] for Defendant, or anyone acting on behalf of Defendant, to call an unlimited number of times, at all times of the day or night, and/or use deceptive tactics to both engage and extract payment from Plaintiff for the debts alleged.

(*Id.* at ¶ 30.) These allegations at least indicate that Plaintiff believed that an arbitration

agreement could be raised as an affirmative defense in her case. However, it remains

unclear whether the arbitration agreement at issue in Plaintiff's Complaint is actually the one

4

attached to Defendants' Brief in Support of its Motion to Dismiss. (See Agreement, Doc. 5, Ex. 1A.) Though Plaintiff does not specifically deny in subsequent briefing that the Agreement submitted is the one at issue, she also repeatedly denies (without greater factual clarification) that she ever validly consented to an arbitration agreement at all.

Thus, the pleadings and briefs present a paradigmatic example of "unclarity" under *Guidotti*. It is therefore necessary for the Court to treat the Motion to Compel arbitration only in the context of a motion for summary judgment. Doing so necessitates allowing the parties time for limited discovery before the Court can rule on whether arbitration is warranted. *See Guidotti*, 716 F.3d at 776 ("After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard.") Such discovery must, however, be limited to the issues of whether the Credit Agreement submitted is a true and accurate copy of the Agreement at issue in this case; whether Plaintiff validly expressed assent to the agreement, whether by clicking a box on the online credit application stating her assent or otherwise; and whether there is some other reason to void the agreement or find it unenforceable.

Nonetheless, before the parties engage in limited discovery, the Court believes that it is appropriate to provide guidance on the arguments raised in their briefing to the Motion to Dismiss. Though not necessary to the resolution of the present Motion, the Court offers its opinions on the arguments raised therein, so that the parties do not engage in unnecessary

discovery or raise duplicative arguments in their briefing on summary judgment, when such arguments may well be unavailing.  All that follows is offered to that end.

### b. Motion to Compel Arbitration

Assuming that the Court is presented on summary judgment with an undisputedly true and accurate copy of the Credit Agreement, the Court will then need to decide whether that Agreement is sufficient to compel arbitration.  As discussed in more detail below, the Federal Arbitration Act (FAA), 9 U.S.C. § 1, et seq., protects the enforceability of written agreements to arbitrate disputes between contracting parties.  Under that Act,

> [a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

*Id.* at § 4.  "The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  *Id.*  In so doing, the Court "must resolve 'any doubts concerning the scope of arbitrable issues in favor of arbitration.'"  *CardioNet, Inc. v. Cigna Health Corp.*, 751 F.3d 165, 172 (3d Cir. 2014) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25, 103 S. Ct. 927, 941, 74 L. Ed. 2d 765 (1983)) (internal alterations omitted).  If the Court determines that the case must be arbitrated, it "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the

terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3.

## IV.   Analysis Based on Documents Submitted Thus Far

### a.  Terms of the Credit Agreement

On the first page of the Credit Agreement submitted by Defendants the following passage appears:

> **Notice:** This Credit Agreement contains an arbitration provision.  Under this arbitration provision, you may be required to settle any dispute with CIT Bank, Dell Financial Services and others through arbitration and not through a court proceeding.

(Doc. 5, Ex. 1A, at 1.)  On page five, under the bold and capitalized heading "Arbitration Notice," the Agreement states:

> **THIS AGREEMENT CONTAINS AN ARBITRATION CLAUSE, PLEASE READ THIS PROVISION CAREFULLY.  IT PROVIDES THAT ANY CLAIM RELATING TO YOUR ACCOUNT MAY BE RESOLVED BY <u>BINDING ARBITRATION</u>.  YOU ARE ENTITLED TO A FAIR HEARING, BUT THE ARBITRATION PROCEDURES ARE SIMPLER AND MORE LIMITED THAN RULES APPLICABLE IN COURT, AND ARBITRATION DECISIONS ARE SUBJECT TO VERY LIMITED REVIEW.  CLAIMS MAY BE ARBITRATED ONLY ON AN INDIVIDUAL BASIS.  <u>IF EITHER PARTY CHOOSES TO ARBITRATE A CLAIM, NEITHER PARTY WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR TO HAVE A JURY TRIAL ON THAT CLAIM, OR TO PARTICIPATE IN A CLASS ACTION OR REPRESENTATIVE ACTION WITH RESPECT TO SUCH CLAIM</u>.**

(*Id.* at 5.)  The Agreement further specifies that the arbitration provision applies to

> any claim, dispute or controversy (whether based upon contract; tort, intentional or otherwise; constitution; statute; common law; or equity and whether pre-existing, present or future), including initial claims, counter-claims, cross-claims and third-party claims, arising from or relating to this

Agreement or the relationships which result from this Agreement, including the validity or enforceability of this arbitration clause . . . .

(*Id.*)

In the beginning of the Agreement, the signer is put on notice that "[i]f you reject the terms and conditions contained in the Agreement, you still have time to cancel your Account and avoid any finance charges and other credit costs," and then specifies the mechanism by which to cancel the Account: namely, by notifying Defendant at a specified telephone number "within three days of receipt of the Agreement." (*Id.* at 1.)

### b. Enforceability of the Arbitration Provision

In passing the Federal Arbitration Act, "Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration." *Southland Corp. v. Keating*, 465 U.S. 1, 10, 104 S. Ct. 852, 858, 79 L. Ed. 2d 1 (1984). Section 2 of the Act provides:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. This language "reflects the fundamental principle that arbitration is a matter of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67, 130 S. Ct. 2772, 2776, 177 L. Ed. 2d 403 (2010). Through section 2, the Act "places arbitration agreements on an

8

equal footing with other contracts and requires courts to enforce them according to their terms." *Id.* (internal citations omitted). "Like other contracts, however, they may be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'" *Id.* at 68 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 1656, 134 L. Ed. 2d 902 (1996)).

Defendants believe that the *Rent-A-Center* decision requires this Court to order the case to arbitration without ruling on the unconscionability arguments raised in Plaintiff's brief at all. They argue that such questions must be submitted to the arbitrator when, as here, the Agreement contains a provision stating that "any claim, dispute or controversy . . . including the validity or enforceability of this arbitration clause" must be handled in arbitration. (*See* Doc. 5, Ex 1A, at 5.) In other words, according to Defendants, *Rent-A-Center* stands for the proposition that, when the agreement at issue "commits to an arbitrator the question of enforceability and validity of an arbitration agreement, courts must respect that delegation and leave to the arbitrator 'gateway questions of arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy." (Doc. 5 at 7-8 (quoting *Rent-A-Center*, 561 U.S. at 68-69).)

The Court cannot agree with this application of *Rent-A-Center*. Though the *Rent-A-Center* Court did state that "gateway questions of arbitrability" should in certain circumstances be decided by an arbitrator and not by federal courts, its holding was limited to those circumstances in which a party challenged the validity of the contract *as a whole*

and did not challenge the arbitration provision specifically. *See Rent-A-Center*, 561 U.S. at

70-71. If, conversely, "a party challenges the validity under § 2 of the precise agreement to

arbitrate at issue, the federal court *must consider* the challenge before ordering compliance

with that agreement under" the FAA. *Id.* at 71 (emphasis added). The Third Circuit

subsequently explained the *Rent-A-Center* decision as follows:

> In *Rent-A-Center, West, Inc. v. Jackson*, the Supreme Court found that the
> plaintiff failed to challenge the validity of the arbitration agreement at issue.
> The contract containing the general agreement to arbitrate disputes also
> contained a specific agreement to arbitrate questions of arbitrability. 130 S.
> Ct. at 2777. To eliminate the confusion caused by an agreement to arbitrate
> nested within another agreement to arbitrate, the *Rent-A-Center* Court found
> it necessary to distinguish between the overall arbitration agreement (the
> "contract"), and the agreement to arbitrate arbitrability (the "delegation
> clause"). *Id.* at 2778–79. The problem was that the plaintiff "challenged only
> the validity of the contract as a whole" rather than the validity of the
> delegation clause. *Id.* at 2779. Because the delegation clause was severable
> from the contract, it was unaffected by the contract's validity; thus, the
> Supreme Court held that in accordance with the valid delegation clause,
> questions of arbitrability (including the arbitrability of the overall agreement to
> arbitrate) must go to an arbitrator. *Id.* at 2778–79.

*Quilloin v. Tenet Healthsystem Philadelphia, Inc.*, 673 F.3d 221, 229 (3d Cir. 2012). The

*Quilloin* court concluded that because, among other things, "Quilloin . . . claims that the

*arbitration agreement, specifically*, is unconscionable," it was appropriate for the District

Court to rule on the issue of unconscionability. *Id.* at 230 (emphasis added).

Likewise, in the present case, though Plaintiff's arguments are often unclear, they all

appear to attack the conscionability of the arbitration agreement itself, and not the

Agreement as a whole. It is the *arbitration clause* that, among other things, Plaintiff

10

denounces as adhesive, as providing a forum beneficial to corporations, as hidden in a

lengthy contract, and as offering a "get of jail free card" for illegal corporate activity. (*See*

Section IV.d.i-ii., *infra.*)  Throughout the course of Plaintiff's thirteen-page brief, the Court

can find no mention of any other clauses within the Agreement to which Plaintiff objects.

Accordingly, *Rent-A-Center* does not operate to preclude judicial consideration of this

gateway question of arbitrability.  Because Plaintiff's various arguments all appear to center

on the same issue—that the arbitration clause is unconscionable—the Court now proceeds

to the question of whether any gateway questions would preclude the enforcement of the

arbitration clause when it is presented to the Court in the proper manner.

### c. Enforceability of the Clickwrap Agreement

At the outset, there is a potential issue as to whether the purported "clickwrap"

nature of the Credit Agreement is enforceable.  Technically, this is an issue of enforceability,

not unconscionability, though in the course of briefing the two issues get mixed together.

(*See* Doc. 9 at 11 ("A checkmark on a web page is, according to Defendants, all that is

needed for Plaintiff to agree to a multitude of harassing or intimidating behavior affected

upon her . . . .").

"A clickwrap agreement appears on an internet webpage and requires that a user

consent to any terms or conditions by clicking on a dialog box on the screen in order to

proceed with the internet transaction." *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236

(E.D. Pa. 2007).  "To determine whether a clickwrap agreement is enforceable, courts

11

presented with the issue apply traditional principles of contract law and focus on whether

the plaintiffs had reasonable notice of and manifested assent to the clickwrap agreement."

*Id.* (collecting cases). Though these agreements represent a relatively new subset of

contract law, and therefore are not the subject of any judicial decisions that are directly

precedential to this Court, "[c]lickwrap agreements are increasingly common and 'have

routinely been upheld.'" *Hancock v. Am. Telephone & Telegraph Co., Inc.*, 701 F.3d 1248,

1256 (10th Cir. 2012) (quoting *Smallwood v. NCsoft Corp.*, 730 F. Supp. 2d 1213, 1226 (D.

Haw. 2010)); for other cases upholding clickwrap agreements, see, for example, *A.V. v.*

*iParadigms, Ltd. Co.*, 544 F. Supp. 2d 473, 480 (E.D. Va. 2008), *rev'd on other grounds by*

562 F.3d 630 (4th Cir. 2009); *Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 425

F. Supp. 2d 756, 783 (N.D. Tex. 2006); *Person v. Google, Inc.*, 456 F. Supp. 2d 488, 496-97

(S.D.N.Y. 2006); *Koresko v. RealNetworks, Inc.*, 291 F. Supp. 2d 1157, 1163 (E.D. Cal.

2003); *Burcham v. Expedia, Inc.*, 2009 WL 586513, at *3 (E.D. Mo. 2009).

Courts have occasionally struck down clickwrap agreements, most notably in the

Second Circuit decision in *Specht v. Netscape Communications Corp.*, 306 F.3d 17 (2d Cir.

2002). However, such cases rest on a finding that there is some fatal defect in the way that

the Terms and Conditions of an agreement were posted, such that the person challenging

the agreement cannot be considered to have actually known about the existence of the

agreement. *See, e.g., Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 402 (2d Cir. 2004)

(noting that the *Specht* decision rested on a finding that "[t]here was no basis for imputing to

12

the [party challenging the clickwrap agreement] knowledge of the terms" contained in that agreement and that "[w]e ruled against Netscape and in favor of the users of its software because the users would not have seen the terms Netscape exacted without scrolling down their computer screens, and there was no reason for them to do so"); *see also Specht*, 306 F.3d at 31 (basing its holding on the finding that "[w]e are not persuaded that a reasonably prudent offeree in these circumstances would have known of the existence of license terms. Plaintiffs were responding to an offer that did not carry an immediately visible notice of the existence of license terms or require unambiguous manifestation of assent to those terms.").

Based on the representations submitted to date, the Credit Agreement was not displayed on the screen, but was only accessible by hyperlink. (*See* Stephen Stippel Decl., Doc. 5, Ex. 1, at ¶ 9.) However, Defendants also aver that Plaintiff would still have to affirm her assent to the Credit Agreement before opening a credit account, (*id.* at ¶¶ 8-9), which could potentially put her on notice of the existence of the Agreement's terms. At the summary judgment stage, the Court may need to determine whether these facts, if established, make Defillipis's case more like that addressed in *Specht* or more like that in the other district court cases upholding clickwrap agreements.

### d. Unconscionability

As stated in *Quilloin*:

We generally apply state contract principles to determine whether an arbitration agreement is unconscionable. [*AT&T Mobility LLC v.*] *Concepcion*, [___ U.S. ___,] 131 S. Ct. [1740,] 1746[, 179 L. Ed. 2d 742 (2011)] (construing the FAA, as codified at 9 U.S.C. § 2). However, the FAA

13

preempts conflicting state rules that either prohibit arbitration outright, *id.* at 1747, or that "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *id.* at 1753 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 85 L. Ed. 581 (1941)). Thus, in determining unconscionability, we must use principles of Pennsylvania law, to the extent that such law is not displaced by the FAA.

　　　　To prove unconscionability under Pennsylvania law, a party must show that the contract was both substantively and procedurally unconscionable. *Salley v. Option One Mortg. Corp.*, 592 Pa. 323, 925 A.2d 115, 119 ([Pa.] 2007). In examining these two prongs, the Pennsylvania Supreme Court has indicated that it might be appropriate to use a "sliding-scale approach" so that "where the procedural unconscionability is very high, a lesser degree of substantive unconscionability may be required" and presumably, vice-versa. *Id.* at 125 n.12.

*Quilloin*, 673 F.3d at 230.

### i. Substantive Unconscionability

A contractual provision is substantively unconscionable when it "unreasonably favors the party asserting it." *Salley*, 925 A.2d at 119. "Put another way, 'substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent.'" *Quilloin*, 673 F.3d at 230 (quoting *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999)).

Most of Plaintiff's attacks on the substantive unconscionability of the arbitration agreement, however, falter at the outset. They tend to rely almost entirely on bloviation and very little on case law. Thus, Plaintiff begins her argument with generalized attacks on the concept of corporate personhood. (Doc. 9 at 3.) She then proceeds to imply that arbitration agreements are *ipso facto* unjust, in that they reflect an exercise of corporate power that

14

amounts to "a sporting event where officials enforce the rules precisely on one side but not the other" and that will—apparently inevitably—lead to a favorable outcome for the Defendants. (*Id.*) In this regard, she argues that, regardless of whether she freely consented to the arbitration agreement, "one [cannot] consent to an elimination of Due Process rights, when such elimination would inevitably lead to sanctioning criminal behavior, such as harassment [as alleged in the Complaint] that would certainly lead to jail time if one noncorporate individual did so [*sic*] to another." (*Id.*) Rather than being a valid subject of contract, arbitration is, according to Plaintiff, a "get out of jail free card" that would subject a private individual to the "obvious disadvantages" of a forum "where the arbiter is both selected and paid by a corporation." (*Id.* at 9.)

These arguments are plainly contradicted by case law. Preliminarily, the argument that arbitration is a "get out of jail free card" essentially amounts to an argument that arbitration is unlawful because it could lead to a judgment for the Defendants. But, while it could lead to such a judgment, this can hardly be considered a demerit. This Court sits as a neutral decisionmaker, and cannot base its decisions on which forum will give Plaintiff the greatest chance of success.

Moreover, under the relevant case law, arbitration agreements are clearly enforceable. *See, e.g., Concepcion,* 131 S. Ct. at 1745 ("[C]ourts must place arbitration agreements on an equal footing with other contracts and enforce them according to their terms."). Therefore, when Plaintiff proceeds into specious slippery-slope arguments with

15

claims that judicial enforcement of arbitration agreements will somehow logically lead to the

reinstitution of debtor's prisons or—oddly enough—to the *de facto* legalization of drugs and

prostitution (because both are based on contractual agreements between buyer and

supplier), (*see* Doc. 9 at 4), she misses the issue before this Court entirely. The point at

issue is in fact very simple: this Court must enforce arbitration agreements because binding

case law has established that they are legally valid contracts. In this regard, it is highly

relevant that the Supreme Court has repeatedly rejected "generalized attacks on arbitration

that rest on 'suspicion of arbitration as a method of weakening the protections afforded in

the substantive law to would-be complainants.'" *Green Tree Fin. Corp.-Alabama v.*

*Randolph*, 531 U.S. 79, 89-90, 121 S. Ct. 513, 521, 148 L. Ed. 2d 373 (quoting *Rodriguez*

*de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 481, 109 S. Ct. 1917, 1920,

104 L. Ed. 2d 526 (1989)); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,*

*Inc.*, 473 U.S. 614, 634, 105 S. Ct. 3346, 3357-58, 87 L. Ed. 2d 444 (1985) ("We decline to

indulge the presumption that the parties and arbitral body conducting a proceeding will be

unable or unwilling to retain competent, conscientious, and impartial arbitrators."). As the

Supreme Court has rejected these attacks, so must we.

When we put aside the bluster of Plaintiff's generalized attacks, her argument

essentially amounts to a basic claim that the arbitration clause at issue is unconscionable.

In arguments that relate to its substantive unconscionability, she sometimes indicates that

the clause must be voided because it permits Defendants to engage in illegal behavior by

shielding them from judicial scrutiny. (*See* Doc. 9 at 10.)  At others times, she indicates that

it should be voided because it falls outside the scope of the original Credit Agreement, in

that "the scope of an agreement [to arbitrate cannot] possibly anticipate criminal behavior in

a collection action." (*Id.* at 11-12.)

The latter of these two arguments is easily dismissed.  First, despite Plaintiff's

rhetoric to the contrary, this case does not involve criminal behavior.  There are no

allegations in the Complaint that criminal charges have been filed or that a criminal

investigation has commenced or, indeed, was even contemplated.  In the absence of such,

it is not Plaintiff's prerogative—as a civil litigant—to allege violations of the criminal law.

Second, this case is pleaded as an action in tort. (*See* Compl. at pp. 15-32 (alleging

negligent and intentional violations of various statutes, invasion of privacy, intentional

infliction of emotional distress, and civil harassment).)  But the arbitration provision

specifically provides that "any claim, dispute or controversy . . . whether based upon . . . tort,

intentional or otherwise" is subject to arbitration. (Doc. 5, Ex. 1A, at 5.)  Thus, submitting

this matter to arbitration clearly falls within the express language of the Agreement.  If this is

in fact the Agreement at issue, then Plaintiff cannot rationally argue to the contrary.  Instead,

she merely resorts to equivocation, and improperly classifies her tort claims as criminal

ones.

Therefore, the remaining question concerning substantive unconscionability is

whether the arbitration provision "unreasonably favors the party asserting it."  Upon review

of that provision as submitted, the Court cannot conclude that it does.

The Third Circuit has held that where "an arbitration provision requires only one side to submit its claims (personal injury or otherwise) to arbitration, *but does not alter or limit the rights and remedies available to that party in the arbitral forum*, it cannot be said that the parties' agreement is substantively unconscionable." *Edwards v. HOVENSA, LLC*, 497 F.3d 355, 364 (3d Cir. 2007) (emphasis added). The provision submitted in the present case does not alter or limit Plaintiff's rights or remedies, insofar as it specifically preserves the arbitrator's power to "grant whatever relief would be available in court under law or in equity." (*See* Doc. 5, Ex. 1A, at 6.) Moreover, unlike the provision discussed in *Edwards*, arbitration is only compulsory in the one submitted to this Court "upon election by you or us," i.e., by *either* party. (*See id.* at 5.) It is therefore more favorable to the party resisting arbitration than the provision that the Third Circuit already found *not* unconscionable in *Edwards*. *See Edwards*, 497 F.3d at 364.

Next, the instant arbitration provision allows the party moving for arbitration to pick one of three well-known and respected arbitrators to resolve the claim: either JAMS, the American Arbitration Association, or the National Arbitration Forum. (Doc. 5, Ex. 1A, at 5.) If the nonmoving party disagrees with the moving party's choice, she may veto that choice and pick one of the remaining two arbitrators. (*Id.*) Moreover, the arbitration provision provides that, if Dell initiates arbitration, it "will pay the entire amount of the arbitration fees, including any required deposit." (*Id.*) While the arbitration provision requires each party to

18

"be initially responsible for payment of its own attorney fees, witness fees and similar expenses," it preserves the arbitrator's right to award these fees and expenses back to the prevailing party. (*Id.* at 6); *cf. Parilla v. IAP Worldwide Servs., VI, Inc.*, 368 F.3d 269, 279 (3d Cir. 2004) (holding a "provision requiring each party to 'bear its own costs and expenses, including attorney's fees'" substantively unconscionable). And, though Plaintiff impugns the neutrality of an "arbiter [who] is both selected and paid by a corporation," (Doc. 9 at 9), the Supreme Court has indicated that the failure of an arbitration agreement to "provide [plaintiff] protection from potentially substantial costs of pursuing her federal statutory claims in the arbitral forum" is a potential ground for finding the agreement unconscionable, *see Randolph*, 531 U.S. at 89-92 (considering, but rejecting on the facts, an argument that such an agreement was unconscionable); *see also Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 203 (3d Cir. 2010) ("Provisions in arbitration clauses requiring parties to bear their own attorney's fees, costs, and expenses work to 'the disadvantage of an employee [i.e., the weaker party adverse to arbitration] needing to obtain legal assistance.'") (quoting *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 267 (3d Cir. 2003)). Therefore, the Court concludes that, rather than being a sign of unconscionability, these expense-shifting provisions are evidence that the arbitration clause before it would be valid and enforceable. If this were not the case, then essentially no arbitration agreement could ever be enforceable; if an agreement did not provide reimbursement to the party in the weaker bargaining position, then it could be found unconscionable under the case law, while, if it did

19

provide such reimbursement, it would be found unconscionable under the argument that Plaintiff advances. This would clearly contradict Congress's "national policy favoring arbitration."

There is nothing else in the submitted Agreement that Plaintiff could reasonably argue "limits her rights and remedies" such that the arbitration provision could be found substantively unconscionable. The only right that it clearly limits is her right to join or consolidate her claim with those of other plaintiffs, or to pursue a class action (as the current Complaint attempts to do). (*See* Doc. 5, Ex. 1A, at 5.) However, the Supreme Court recently held that an arbitration agreement that eliminates access to class action procedures cannot be invalidated on that ground, and that a decision to the contrary would frustrate the national policy expressed in the FAA. *Concepcion*, 131 S. Ct. at 1750-53. *Concepcion* therefore precludes this avenue of attack.

Finally, the arbitration provision does state that, in agreeing to arbitration, the Plaintiff will give up her rights to a judicial forum, a jury trial, and certain access to discovery. (Doc. 5, Ex. 1A, at 6.) But these are nothing more than the normal incidents of arbitration. If Plaintiff wishes to attack these, then she is in the same place she was before: making generalized attacks based on a suspicion of arbitration that cannot be countenanced by Supreme Court case law.

Accordingly, the Court finds, if this arbitration clause were properly brought before it and established as undisputed on a summary judgment motion, it could not be found

substantively unconscionable.

### ii.  Procedural Unconscionability

A contractual provision is procedurally unconscionable "where there was a lack of meaningful choice in the acceptance of the challenged provision." *Salley*, 925 A.2d at 119. In this regard, "courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds 'for the revocation of any contract.'" *Quilloin*, 573 F.3d at 235 (quoting *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32-33, 111 S. Ct. 1647, 1656, 114 L. Ed. 2d 26 (1991)).

"[The Pennsylvania Supreme] Court and the federal courts in Pennsylvania, however, have refused to hold contracts unconscionable simply because of a disparity in bargaining power." *Witmer v. Exxon Corp.*, 434 A.2d 1222, 1228 (Pa. 1981); *cf. Gilmer*, 500 U.S. at 33 ("Mere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context.  Relationships between securities dealers and investors, for example, may involve unequal bargaining power, but we nevertheless held in *Rodriguez de Quijas*[, 490 U.S. at 484] and [*Shearson/American Express, Inc. v.*] *McMahon*[, 482 U.S. 220, 230, 107 S. Ct. 2332, 2339-40, 96 L. Ed. 2d 185 (1987)] that agreements to arbitrate in that context are enforceable.")

"Under Pennsylvania law, a contract is generally considered to be procedurally unconscionable if it is a contract of adhesion." *Quilloin*, 673 F.3d at 235.  "A contract of

21

adhesion is a form or standardized contract prepared by a party of superior bargaining power, to be signed by the party in the weaker position, who only has the opportunity to agree to the contract or reject it, without an opportunity to negotiate or bargain." *Feldman*, 513 F. Supp. 2d at 240. However, and most relevant here, "[a]n adhesion contract is not necessarily unenforceable. The party challenging the contract therefore must also establish substantive unconscionability." *Parilla*, 368 F.3d at 276 (quoting *Alexander*, 341 F.3d at 265).

Based on this case law—and upon a subsequent finding that the arbitration provision submitted actually applies in this case—Plaintiff's argument that the arbitration provision "if it was ever apparent at all, was so difficult to find and discern that it could easily be dismissed as an adhesion clause" may be unavailing. (*See* Doc. 9 at 3.) Even assuming that the arbitration provision was hidden in the agreement,[2] Plaintiff would also need to show substantive unconscionability to be able to avoid arbitration. Based on Plaintiff's arguments thus far, she would be unable to show substantive unconscionability, and any challenge to the arbitration provision on unconscionability grounds would therefore likely fail as well.

---

[2] This argument, to the extent the Court needs to consider it, is quite tenuous. Subject to later discovery, there is little evidence at this stage that the arbitration provision was unapparent or difficult to find. Indeed, it begins with the bold and capitalized words "**ARBITRATION NOTICE**" and continues for approximately two (or 25%) of the eight total pages that make up the Agreement. (*See* Doc. 5, Ex. 1A, at 5-6.) The phrase "Arbitration Notice" and the information that follows is one of only seven portions of the entire Agreement to be both bolded and capitalized (and one of the other six is also a reference to arbitration rights). Moreover, the arbitration provision's most important terms—i.e., that in agreeing to arbitration, Plaintiff foregoes her class action rights and other components of a judicial forum—are also highlighted in bold.

## V.    Conclusion

For the reasons discussed above, the Court finds that the Motion to Stay

Proceedings and Compel Arbitration (Doc. 4) cannot be resolved under Rule 12(b).

Therefore, that Motion is **DENIED WITHOUT PREJUDICE** to be refiled in conjunction with a

proper Rule 56 Motion for Summary Judgment.  A separate Order follows.

Robert D. Mariani
United States District Judge